# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CASE NO.  1:19-CR-705 |
| Plaintiff, | : | |
| | : | JUDGE SOLOMON OLIVER, JR. |
| vs. | : | |
| AARON GAGE, | : | **DEFENDANT'S MOTION FOR BOND AND FOR EMERGENCY INTERVENTION BY THE COURT** |
| Defendant. | : | |
| | : | |

Defendant Aaron Gage, by and through the undersigned, hereby moves this Court for immediate, temporary release under 18 U.S.C. § 3142(i). Doctor Venktesh Ramnath, a board-certified physician in Internal Medicine, Pulmonary Disease, and Critical Care Medicine, has concluded that "Mr. Gage demonstrates several risks of contracting a severe illness due to COVID[-]19." (Exh. A: Expert Report, Exh. B: Ramnath CV). These risk factors include a Body Mass Index of 48, which presents "a 3.6x risk of severe COVID[-]19 disease" based on existing studies. (Exh. A: Expert Report, p. 12; CDC listing individuals with a BMI over 40 at higher risk for severe illness[1]). For reasons detailed below, Mr. Gage's incarceration at NEOCC places him in situation where he is at an unreasonable risk of contracting the disease. This unreasonable risk of severe illness or death qualifies as compelling reasons and justify temporary release under 18 U.S.C. § 3142(i).

---

[1] Available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html

Alternatively, Mr. Gage requests this Court order North East Ohio Correctional Center (NEOCC) to immediately implement ten recommended strategies for mitigating the spread of COVID-19 within the facility. These strategies come directly from Doctor Ramnath. (Exh. A: Expert Report). Dr. Ramnath, after reviewing internal documents from the Corrections Corporation of America (Corporation), concludes "the existing processes are inadequate," the screening process for COVID-19 transmission is outdated, and the Infection Control Policy is "inadequate." (Exh. A: Expert Report, p. 12-13). "[T]he facility administration is inappropriately minimizing the risk of COVID[-]19 in its facility, not just to inmates and staff/contractors but also [to] the community at large." (Exh. A: Expert Report, p. 14). There is urgency to NEOCC implementing these mitigation strategies. COVID-19 presents an emergency at our largest holding facility. Mr. Gage request this Court immediately order the implementation of the ten recommended strategies to mitigate the risk of COVID-19's spread in NEOCC.

## I. Mr. Gage is at high risk of severe illness from COVID-19 and presents compelling reasons for temporary release.

This Court should order Mr. Gage released temporarily under 18 U.S.C. § 3142(i). Even if NEOCC implements all ten recommendations immediately, Mr. Gage remains at "a very high risk" of severe illness from COVID-19. (Exh. A: Expert Report, p. 12). Mr. Gage's heightened risk of severe illness or even death offers a compelling reason for temporary release under the law. *United States v. Perez*, No. 19 CR. 297 (PAE), 2020 WL 1329225, at *1 (S.D.N.Y. Mar. 19, 2020) (temporarily releasing defendant under § 3142(i) due to the "heightened risk of dangerous complications should he contract COVID-19").

Even after a person has been ordered detained, the Bail Reform Act provides for the "temporary release" of a person in pretrial custody "to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense *or for another compelling*

2

*reason*." 18 U.S.C. § 3142(i) (emphasis added). The health risk to Mr. Gage, because of his medical conditions, coupled with the conditions at NEOCC, qualify as "compelling reason[s]" within 18 U.S.C. § 3142(i).

Dr. Ramnath opines that Mr. Gage presents major risk factors as defined by the CDC guidelines. Because of these risk factors, "Mr. Gage faces a very high risk of severe COVID19 disease if he were to contract the illness." (Exh. A: Expert Report, p. 12). These factors include being an obese African-American male who likely suffers from asthma and metabolic syndrome. Dr. Ramnath explains that Mr. Gage's BMI (Body Mass Index) of 48 confers "a 3.6x risk of severe COVID[-]19 disease" based on existing data. Additionally, the research data suggests that African-American males have "been associated with substantially worse outcomes" from COVID-19 infections. (Exh. A: Expert Report, p 3). If these risks alone were not bad enough, Mr. Gage is likely suffering from asthma or chronic respiratory disease and "metabolic syndrome," which is commonly found in obese Americans. Metabolic syndrome typically includes diabetes, high blood fats, and cardiovascular disease. (Exh. A: Expert Report, p. 12). All of these factors place Mr. Gage in a vulnerable population who must take extra precautions from contracting the virus.

Even if NEOCC were to implement the recommended procedures immediately, the mitigation would not be enough to mitigate the risk to Mr. Gage. (*See Wilson et. al v. Williams et. al.*, Case No. 4:20-CV-794, Dkt. 22 at p.5 (N.D. Ohio Apr. 22, 2020) (finding the mitigation efforts by the BOP at Elkton while commendable are woefully inadequate to stem the spread of the virus inside the prison). There is "increasing data that demonstrate[s] that individuals who are infected can transmit infection to others before developing symptoms themselves." (Exh. A: Expert Report, p. 9; *See also Wilson*, Case No. 4:20-CV-794, Dkt. 22 at p. 5). The large majority of people infected, some 81% according to the study cited by Dr. Ramnath, will only exhibit mild symptoms

and will never properly be diagnosed. NEOCC cannot isolate something they cannot identify. *See also Wilson*, Case No. 4:20-CV-794, Dkt. 22 at p. 5 (the screening being conducted by the BOP "will only help to identify individuals with active symptoms, not those asymptomatic individuals who can nevertheless spread the virus undetected.").

We know the virus has already entered the doors of NEOCC. (See Exh.: C – Corporation documents notifying of contractor and staff member testing positive). We know those who never show symptoms can spread the virus. We know the inmates at NEOCC cannot socially distance from one another and that viruses like COVID-19 have a history of spreading rapidly in prisons and jails. Lastly, we know Mr. Gage is a risk of severe illness if he contracts the virus. Keeping Mr. Gage incarcerated at NEOCC is putting his life at risk. *See In re Manrigue*, 2020 WL 1307109 (N.D. Cal. Mar. 19, 2020) ("The risk that this vulnerable person will contract COVID-19 while in jail is a special circumstance that warrants bail.").

The risk to Mr. Gage's life is a compelling reason justifying his temporary release under 18 U.S.C. § 3142(i). *United States v. Selna*, 8:16-CR-76-JVS (C.D. Cal. Mar. 26, 2020) ("Michaels has demonstrated that the Covid-19 virus and its effects in California constitute 'another compelling reason'" justifying temporary release under § 3142(i)). *United States v. Wells*, Case No. 20-CR-80, Dkt. 24 (N.D. Ohio Apr. 16, 2020) (marginal order granting bond pending sentencing based on COVID-19 and Wells' health issues); *Amaya-Cruz v. Adducci, et. al,* Case No. 20-CV-789, Dkt. 34 (N.D. Ohio Apr. 18, 2020) (order granting release to ICE detainee who is susceptible to serious illness or death if exposed to the virus). If this Court orders Mr. Gage released, it is his intention to stay with his girlfriend, Catherine Squire, who is able to provide a safe residence where Mr. Gage will not be exposed to COIVD-19. Also, because of his home

confinement and knowledge of SD/PPE, Mr. Gage will not spread the virus to the public, if he is in fact positive due to his incarceration at NEOCC.

## II. Alternatively, this Court should order NEOCC to implement immediately the ten mitigation strategies recommended by Dr. Ramnath.

The defense retained also Dr. Venktesh R. Ramnath to review the current conditions of NEOCC and opine as to the risk of COVID-19 spreading throughout the institution. Dr. Ramnath is actively practicing and fighting the COVID-19 virus in his own hospital and is an internationally recognized authority on the epidemiology of COVID-19.[2]

Mr. Gage admits he is seeking unprecedented relief. But these are unprecedented times, and other Courts have been receptive to this type of request. (Exh. D: NY General Order[3]). If

---

[2] In forming his opinion, Dr. Ramnath only considered the Corporation's stated policies in their own internal memorandum. (*See* Exh. C: CoreCivic Documents). Dr. Ramnath did not consider the facts set out by the defense under investigation done by the Office of the Federal Defender.

[3] Other examples include:

Federal Judge Orders Testing Measures at Cook County Jail, but Rejects Request to Order Immediate Release Due to Coronavirus. (Apr. 9, 2020)
https://www.washingtonpost.com/local/legal-issues/judge-orders-emergency-dc-jail-overhaul-of-medical-cleaning-social-distancing-practices-and-defense-lawyer-access-to-stem-coronavirus/2020/04/19/9c02e80a-8255-11ea-ae26-989cfce1c7c7_story.html

Judge Orders Emergency D.C. Jail Overhaul of Medical, Cleaning, 'Social Distancing' Practices and Defense Lawyer Access to Stem Coronavirus. (Apr. 19, 2020)
https://www.washingtonpost.com/local/legal-issues/judge-orders-emergency-dc-jail-overhaul-of-medical-cleaning-social-distancing-practices-and-defense-lawyer-access-to-stem-coronavirus/2020/04/19/9c02e80a-8255-11ea-ae26-989cfce1c7c7_story.html

Judge Orders Oakland County Jail to Protect Inmates from Coronavirus. (Apr. 21, 2020)
https://www.michiganradio.org/post/judge-orders-oakland-county-jail-protect-inmates-coronavirus

action is not taken, our Court system and the surrounding community may be faced with a humanitarian crisis we are ill prepared to handle. The Youngstown area is already under great strain during this pandemic.[4] Taking action now will ensure the health, safety, and well-being of not only the inmate population, but also of attorneys, judges, prosecutors, probation officers, marshals, court security officers: our entire Judicial System. Everyone is at risk to the COVID-19 pandemic.

Doctor Ramnath has provided the Court with ten solutions to mitigate the pending crisis at NEOCC.  The Doctor has provided the best solutions available given the epidemiology known today and review of the measures implemented by the Corporation at NEOCC. Dr. Ramnath opines, "[i]n the case of COVID-19, recommended measures that should be initiated <u>immediately</u> include the following:

> **1. Reduction of current incarcerated population density;**
>
> - Increase efflux through "decarceration" or release as many people as possible, particularly those with elevated risk factors for COVID19 disease and with minimal likelihood to commit additional crimes
> - Reduce influx through suspension of arrests and sentencing for low-level crimes and misdemeanors
>
> **2. Institution and enforcement of social distancing measures;**
>
> - 6 feet mandatory minimum physical distance between all persons (inmates and staff/contractors) at all times;
> - Reduction of common area activities where social distancing measures cannot be followed reliably;
> - Replacement of in-person visitations with video-based visitations;
> - Restricted and/or regulated access to vendors or suppliers to correctional facilities;
>
> **3. Separation and isolation strategies for suspected and confirmed COVID+ patients away from general prison population;**

---

[4] Ohio's Coronavirus Outbreak is Hitting Youngstown Hardest. (Apr. 15, 2020) https://www.buzzfeednews.com/article/henrygomez/coronavirus-ohio-youngstown

- Single-cell housing wherever possible;
- Creation of wards where multiple confirmed mild COVID+ cases can be grouped

**4. Active screening and surveillance of all inmates and staff/contractors for symptoms and signs of COVID19 illness;**

**5. Active screening of any individual entering the correctional facility for symptoms and signs of COVID19 illness on each occasion;**

**6. Access to medical care providers for urgent medical evaluation, testing, and hospitalization as indicated for any inmates and staff/contractors demonstrating active or equivocal symptoms or signs of COVID19 illness;**

**7. Identification of staff/contractors infected previously who have fully recovered, deemed noninfectious and can serve in various work capacities (e.g. custodial, other) to prepare for possible workforce shortfalls;**
**8. Education around proper respiratory hygiene to all inmates and staff/contractors**

- Methods and rationale for appropriate use of PPE in all inmates and staff/contractors, particularly to those with respiratory symptoms;
- Reinforcement of appropriate cleaning methods and avoidance of surfaces that are potentially contaminated with infected bodily fluids
- Avoidance of touching the face, nose, and eyes in situations where possible contact with infected fluids exists

**9. Reliable access to and adequate supplies of personalized protective equipment (of approved quality standards) for inmates and staff/contractors**

- Staff/contractors: CDC-approved surgical masks, N95 masks, droplet precaution gowns, gloves, face shields/goggles, antimicrobial cleaning supplies
- Inmates: CDC-approved surgical masks, approved antimicrobial soaps and hand sanitizers (>60% alcohol based), sinks, showers, laundry, droplet precaution gowns, gloves, face shields goggles, antimicrobial cleaning supplies;

**10. Institution of auditing and feedback from observation of staff workflows to ensure responsible and effective use of PPE and optimal supplies of PPE.**

(Exh. A: Expert Report at p. 10-11). In order to have their intended effect, these preventive measures must be immediately enacted and enforced. Like many detention facilities across the

7

nation, NEOCC is facing a medical crisis. The difference here is that we yet have an opportunity to "flatten the curve" by taking the measures proposed by Dr. Ramnath. The evidence indicates that we already have confirmed, positive tests for the virus inside NEOCC.[5] Dr. Ramnath suggest that, given this positive tests "[i]t is only reasonable to suspect that if and when other persons are tested in the facility, that they have a significant chance of testing positive as well." (Exh. A: Expert Report at p. 12). This seems intuitive—there is a population of approximately 1613 men at NEOCC, 680 of which are federal detainees, all sharing varying degrees of confined spaces. Temporarily releasing inmates, or releasing inmates on bond, will significantly reduce the density of the population at NEOCC. This is Dr. Ramnath's first recommendation.

The recent events at Marion Correctional Institution demonstrate two things. First, they demonstrate the urgency of this matter—time is of the essence.[6] Second, and perhaps intuitively, they demonstrate the urgency of testing. Yet as of April 20, 2020, NEOCC has tested none of its federal inmate population. (Exh. E: NEOCC Response to Questionnaire). Without this information it is impossible to establish the scope of the problem. The medical community agrees that people may spread the virus without showing any symptoms. (Exh. A: Expert Report, p. 9; *See also Wilson*, Case No. 4:20-CV-794, Dkt. 22 at p. 5). [Accordingly, Dr. Ramnath recommends widespread testing of the inmate population within NEOCC in order to establish an evidentiary baseline for the spread of this novel virus.] (Exh. A. Expert Report, pgs. 6, 7, 10, 12, 14).

These challenges are exacerbated by the apparent unavailability of personal protective equipment, along with the inability of inmates living in such close quarters to social distance. This

---

[5] See Exh A. Expert Report, p 12; Exh. C
[6] Marion County Correctional Institution Now Has More COVID-19 Cases Than Any Single County in Ohio. (Apr. 20, 2020). https://www.clevescene.com/scene-and-heard/archives/2020/04/20/marion-correctional-institution-now-has-more-covid-19-cases-than-any-single-county-in-ohio

8

places both the NEOCC inmate population and their staff at the same, if not greater, risk of that posed to institutions like Marion Correctional facility. Dr. Ramnath cannot say with any certainty when inmates will begin showing active symptoms of COVID-19. The best we know about this novel virus is that even asymptomatic individuals may spread the disease, and that the most serious symptoms (shortness of breath and hypoxia) only occur well after infection. (Exh.: G, The Infection That's Silently Killing Coronavirus Patients, NY Times 4/23/2020). But Dr. Ramnath has opined that there are several reasons why "it is highly likely that inmates in correctional facilities will demonstrate increased COIVD-19 infectious risk." (Exh. A: Expert Report, p. 3). "[T]he data are highly indicative that infection control measures [including Personal Protective Equipment ("PPE") and social distancing], when properly followed, are effective to control disease acquisition and prevent spread." (Exh. A: Expert Report, p. 8).

The State of Ohio has mandated an aggressive testing program. The State of Ohio has quarantined its entire population at NEOCC of 933 prisoners. Furthermore, instructions have been given to Instituions as to how to mitigate the disease in the case of a positive test. Every inmate in the State of Ohio is monitored daily and has temperature taken along with a check for symptoms. (See Exh. H: ODRC COVID19 Update 4/23/2020). According to DRC records, quarantine and symptom checks and testing is taking place at NEOCC. *Id.* It seems axiomatic that the area that houses Federal Detainees at NEOCC should be doing the same. However, Federal detainees are not quarantined, not being tested, not being checked or monitored daily for symptoms.

According to Dr. Ramnath, the measures NEOCC currently has in place are insufficient, vague and sometimes wrong. (Exh. A: Expert Report, p. 12-14 - "It is surprising to see anyone make errors of such a fundamental nature."). Dr. Ramnath opines that action is needed immediately to mitigate the risk of the spread of COVID-19 in the jail. (Exh. A: Expert Report, p.

9

9-10). Right now, given the operational protocols we know from the facility, the facility poses a danger to the community. If the additional facts above are true, then we likely have a burgeoning crisis at NEOCC. The only way this danger can be mitigated is through the steps recommended by Dr. Ramnath and outlined above.

### III. Conclusion

Wherefore, the Defendant Aaron Gage hereby requests that he be immediately released pursuant 18 U.S.C. § 3142(i) to home confinement where he will be in an environment that is both safe for him and the surrounding community. Additionally, during the pendency of this litigation Mr. Gage urges the Court to implement the recommendations of Dr. Ramnath in order to "flatten the curve" at NEOCC for the sake of Mr. Gage, those who work at the facility and to protect the public at large.

Respectfully submitted,

STEPHEN C. NEWMAN
Federal Public Defender
Ohio Bar: 0051928

*/s/ Carlos Warner*
CARLOS WARNER
Assistant Federal Public Defender
Ohio Bar: 0068736
Akron Centre Plaza
50 S. Main St., Suite 700
Akron, OH 44308
Phone: (330) 375-5739 Fax: (330) 375-5738
E-Mail: carlos_warner@fd.org